# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

***

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

JAMES WARRAS, *et al.*,

                Defendants.

Case No. 2:13–cr–439–LDG–VCF

**REPORT & RECOMMENDATION**

MOTION TO SUPPRESS (#67)

James Warras returned home to find eight law enforcement officers searching his modestly-sized duplex. The officers told him that he was not under arrest and was free to leave. When Mr. Warras did not leave, two officers escorted him into the basement, told him that he cannot remain in the home without police supervision, presented him with a search warrant, and interrogated him on the subject matter of the search warrant for two hours.

Now, Mr. Warras moves to suppress the statements he made during that interrogation and a subsequent interrogation. He argues that the first interrogation violated his Fifth Amendment right against self-incrimination and that statements made during the second interrogation are inadmissible "fruits" of the first interrogation. Because the government agrees that Mr. Warras was interrogated on both occasions, the only questions before the court are whether the first interrogation was custodial and required *Miranda* warnings under the Fifth Amendment and, if so, whether statements made during the second interrogation are inadmissible "fruits" of the first interrogation.

To resolve these questions, the court held an evidentiary hearing, heard oral argument, and ordered two rounds of supplemental briefing. For the reasons stated below, the court recommends that Mr. Warras' motion be granted in part and denied in part.

1

# I.  BACKGROUND[1]

On July 16, 2013, a team of nine law enforcement officers arrived at James Warras' Waterford, Wisconsin home to execute a search warrant. (Ex. A. (#70) at 2); (Mins. Proceedings #90). The team consisted of six FBI agents, an analyst, an information technology specialist, and a local police officer. (*Id*. at 3). It was just before 10:00 a.m. (Mins. Proceedings #90).

The six agents, analyst, and information technology specialist arrived in unmarked vehicles; they parked along the street to leave the driveway open. (*Id*.) The police officer, James Steffens, arrived in his patrol car, which he parked directly in front of the house. (*Id*.) The six FBI agents were armed and dressed in flak jackets with FBI markings; Officer Steffens was also armed and wearing his uniform. (*Id*.); (Ex. A. (#70) at 3).

At approximately 10:11 a.m., Officer Steffens stationed himself in Warras' front yard to provide perimeter security. (Min. Proceedings #90). The six armed agents approached Warras' home. (*Id*.). None wore helmets and, in lieu of a battering ram, FBI Special Agent Timothy Ryan Austin, who lead the search, arranged for a locksmith to be on standby in the event that no one was home. (*Id*.)

The agents knocked on the front door and announced their presence. (*Id*.) No one answered (*Id*.) They knocked again. (*Id*.) After ten minutes, the door opened: it was Mr. Warras' twenty-one year old grandson, Zachary Miller. (*Id*.); (Ex. A. (#70) at 3). He was wearing a bath towel. (*Id*.)

The agents stated that they were executing a search warrant and removed Mr. Miller from the home; an agent held the towel to prevent it from dropping, and placed him in handcuffs. (*Id*.) Once outside, Mr. Miller was interrogated. (*Id*.) He explained that his grandfather was at the gym and he had not heard

---

[1] The following facts are taken from the government's Report of Investigation, *see* (Doc. #67-1) at Ex. A–B); (Doc. #70 at Ex. A), and/or testimony obtained during the court's evidentiary hearing, *see* (Mins. Proceedings #90). Parenthetical citations refer to the court's docket.

the knocking because he was in the shower. (Mins. Proceedings #90).

The six agents then entered the home to conduct a protective sweep and determine if additional occupants were present. (*Id.*) No one was found. (*Id.*) The analyst and information technology specialist joined the six agents in the house and the search commenced. (*Id.*) Because it was a hot day, most—if not all—of the agents removed their protective gear. (*Id.*) An agent brought Mr. Miller back into the home, removed his handcuffs, permitted him to dress under supervision, and placed him on the living room couch. (*Id.*) Because the residence was secure, Officer Steffens departed.[2] (*See id.*)

At approximately 10:50 a.m., Mr. Warras pulled into the driveway, entered his living room, and witnessed government agents searching his home and scanning Mr. Miller's cell phone and laptop as he sat on the couch. (*Id.*) Mr. Miller had wanted to leave; but he was informed that if he left he would have to leave his phone so that it could be scanned and copied by the FBI. (*Id.*)

Mr. Warras' entry into the home surprised the agents. (*Id.*) Agent Austin testified that he was unaware that a "potential threat was coming into our controlled space." (*Id.* at 30:00). Mr. Warras was also surprised. (*Id.*) Agent Austin testified that he was "agitated" and "clearly had a lot coming at him at once." (*Id.*) Mr. Warras briefly interacted with one agent; the interaction "wasn't good" and caused Agents Austin and Due to intervene. (*Id.*) Both agents noticed that Mr. Warras was agitated and "becoming more emotional" and "more and more frustrated." (*Id.*)

They identified themselves as FBI agents and told Mr. Warras that he was not under arrest and was free to leave, but informed him that that his car and phone must remain to be searched. (*Id.*); (Ex. A. (#67-1) at 3). The agents also detained Mr. Warras and prevented him from entering his upstairs office.

---

[2] During the evidentiary hearing, Agent Austin testified that he did not know for certain when Officer Steffens had departed because Agent Austin was searching the home. The court finds that Officer Steffens departed before Mr. Warras arrived.

3

(*Id*. at 38:00). Mr. Warras then learned that his grandson had been handcuffed and removed from the house while wearing only a towel, and that the FBI team was investigating companies Mr. Warras was associated with. (Ex. B. (#67-1) at 6).

Mr. Warras appeared distracted by the presence of the FBI and his grandson in the same room; he was unable to focus and did not respond to the FBI's questions. (Mins. Proceedings #90). Agents Austin and Due decided that the shock of the intrusion, combined with the presence of his grandson, was too much for him to process. (*Id*.) The agents, who were visibly armed, escorted Mr. Warras into the basement—a space they chose because they had deemed it secure. (*Id*.) One agent led the way, Mr. Warras followed in the middle, and the other agent took up the rear. (*Id*.)

The agents then presented Mr. Warras with a copy of the search warrant and initiated an interrogation. (*Id*.) The agents told Mr. Warras that he was free to leave; but they did not tell him that the interrogation was voluntary or that he had the right to remain silent. (Ex. B. (#67-1) at 6); (Mins. Proceedings #90 at 35:00, 1:06:00). Mr. Warras then made several incriminating statements. (Ex. B. (#67-1) at 6). He told the agents that one of the companies, Malom Group AG, is a Swiss corporation whose activities are under investigation in Switzerland. (*Id*.) Warras had a "liaison role" with the corporation; Malom Group provided Mr. Warras with a Power of Attorney to conduct business on its behalf in the United States. (*Id*.) He informed the agents that he did not have any documents related to Malom Group's involvement in Switzerland, which the agents sought, because his only involvement was with Malom Group's component in the United States. (*Id*.)

Agent Due then began to ask Mr. Warras more specific questions that the case agent in Las Vegas had prepared for Agents Austin and Due. (Mins. Proceedings #90 at 43:15). At this point, Mr. Warras stated that he would feel more comfortable if an attorney were present. (*Id*.) Agents Austin and Due told him that he was free to contact an attorney and was asked if he knew an attorney who he wanted to call;

4

but he was not Mirandized. (*Id.*) Warras responded, saying he did not have an attorney or know of a specific attorney to call. (*Id.*) Agents Austin and Due then told Warras that the decision to answer questions with or without an attorney was his to make. (*Id.*) They did not tell him that the interrogation was voluntary. (*Id.*)

Mr. Warras reflected and said, "I think I'll just kill myself. This is a small community." (*Id.* at 7). Agents Austin and Due reminded Mr. Warras that the FBI was only executing a search warrant and that he had not been charged with a crime. (*Id.*) Mr. Warras told the agents that he was not serious, but interjected, "[b]ut, I mean, in front of my grandson?" (*Id.*) Agent Austin tried to console Mr. Warras by repeatedly telling him that "this is not the worst day of your life." (Mins. Proceedings #90). He grew concerned about Mr. Warras' mental and physical health and asked whether he required medication. (*Id.*)

The agents also told Mr. Warras that if he remained in the home he could not move around freely; the agents required Mr. Warras to ask permission to change locations within the house. (*Id.*) If permission was granted, an escort was required. (*Id.*) During the court's evidentiary hearing, Agent Austin testified that he did not want Mr. Warras to wander off on his own in the home and that Mr. Warras was kept under someone's supervision at all times. Agent Austin also testified that it was his preference or desire that Mr. Warras leave the home. (*Id.*)

Following this exchange, the mood changed and Mr. Warras stated that he wanted to cooperate in the investigation. (*Id.*) The three returned upstairs and Mr. Warras directed the agents to responsive documents, computers, and electronic devices; he provided the agents with the devices' passwords and informed the agents that he had recently sent some documents to the U.S. Security and Exchange Commission in response to a document request. (Ex. B. (#67-1) at 7).

They engaged in small talk. (*Id.*) They discussed Mr. Warras' health, his employment history, and his various relocations to and from San Diego, Las Vegas, and Waterford. (*Id.*) Mr. Warras said that he

5

has been self-employed for years and that "I haven't really had a job my whole life. I've lived a shit life." (*Id.*)

The agents provided Mr. Warras with a list of eight names. (*Id.* at 8). In response to each name, Warras simply stated "okay," "I don't know him," "he's a lawyer," "she's an escrow agent," and "he probably has twenty thousand documents." (*Id.*) He added that out of all the people, only one person, who he called a booze hound and pill popper, did anything wrong. (*Id.*)

Mr. Warras also explained that he never physically met any of the people. (*Id.*) Is it possible, the agents asked, that the individuals were not legitimate investment professionals? (*Id.*) Mr. Warras balked at the agents' assumption that there were "investors." (*Id.*) He explained that there were people who were paid "to do things," but they did not do what they were paid to do. (*Id.*) He said that the "investors" were akin to contractors and employees and that he "kind of had an idea this [i.e., the investigation] was coming." (*Id.*)

Meanwhile, the agents had finished copying Mr. Miller's phone and he left for work. (Mins. Proceedings #90). Mr. Warras and the agents continued to discuss additional aspects of Mr. Warras' business activities, workout routine, health, and hobbies. (*Id.*); (Ex. B. (#67-1) at 8–9). He showed the agents a surgical scar and various golf scorecards. (Mins. Proceedings (#90). At one point, Mr. Warras had to use the bathroom. (*Id.*) Agent Austin was concerned about Mr. Warras' safety. He searched the bathroom, permitted Mr. Warras to enter, and stood outside prepared to intervene to ensure Mr. Warras did not hurt himself. (*Id.*) Mr. Warras emerged unharmed. (*Id.*) At approximately 1:20 p.m., the team left. (Ex. A. (#70) at 4).

Three days later, on July 19, 2013, Mr. Warras voluntarily met Agent Due at the Forum Family Restaurant in Greenfield, Wisconsin for an interview. (Ex. C (#67-1) at 1). The purpose of the meeting

was to return a duplicate DVD that the FBI had confiscated during the search. (*Id.*) Mr. Warras was not Mirandized. (*Id.*)

After completing paperwork to memorialize the DVD's return, Mr. Warras made a variety of incriminating statements to clarify what he had told the agents three days earlier. (*Id.*) For instance, Mr. Warras confirmed that when he stated he "kind of had an idea this was coming" that he was referring to the arrest of Martin Schlaepfer, Mr. Warras' Swiss associate. (*Id.*) Mr. Warras also stated that Anthony Brandel ordered business cards identifying Mr. Warras as the Executive Vice President of Malom Group. (*Id.* at 1–2).

On April 22, 2015, the court conducted an evidentiary hearing, during which Agent Austin testified to the facts above; and the court heard oral argument. (Min. Proceedings #90). The court granted the parties leave to file supplemental briefs in light of Agent Austin's testimony. On May 1, 2015, the court granted the parties' leave to file a second round of supplemental briefs addressing whether Ninth Circuit law or Seventh Circuit law controls and what, if any, effect Seventh Circuit law has on the parties' positions. (Doc. #98). This report and recommendation follows.

## II.  LEGAL STANDARD

The Fifth Amendment provides, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, the Supreme Court held that the Fifth Amendment requires law enforcement officials to advise a suspect of his right to remain silent and right to an attorney if the suspect is subjected to a custodial interrogation. 384 U.S. 436, 444 (1966). If law enforcement officials do not Mirandize a suspect during a custodial interrogation, the suspect's statements must be suppressed from the prosecutor's case in chief. *Id.* ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-

incrimination."); *Harris v. New York*, 401 U.S. 222 (1971) (holding that confessions obtained in violation of *Miranda* may be used for impeachment purposes).

*Miranda* warnings are designed to neutralize interrogation practices that prevent a suspect from making "a free and rational choice" about speaking. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (citing *Miranda*, 384 U.S. at 464–65). They achieve this goal by requiring the police to "adequately and effectively" advise suspects of the choices the Constitution guarantees. *Seibert*, 542 U.S. at 608 (citing *Miranda*, 384 U.S. at 467). "It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation." *Illinois v. Perkins*, 496 U.S. 292 (1990). The concern is "psychologically rather than physically oriented" because the "the modern practice of in-custody interrogation" involves the application of mental coercion. *Miranda*, 384 U.S. at 448.

In cases like this, where the suspect was not formally arrested or taken into police custody, the suspect is nevertheless considered "in custody" for *Miranda* purposes if he has been "deprived of his freedom of action in any significant way." 384 U.S. at 444. Since *Miranda*, the Supreme Court has enunciated several general definitions of custody, but the ultimate inquiry is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)  (quotation marks and citations omitted); *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam) (same).

The court engages in a three-step inquiry to determine whether a suspect was in custody. *J.D.B. v. N. Carolina*, 131 S. Ct. 2394, 2402 (2011) (citing *Keohane*, 516 U.S. at 112). First, the court examines the totality of circumstances surrounding the interrogation. *J.D.B.*, 131 S. Ct. at 2402; *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008). Second, the court considers whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Craighead*, 539 F.3d at 1082 (citing *Keohane*, 516 U.S. at 112). Third, "[o]nce the scene is

8

set and the players' lines and actions are reconstructed," the court determines whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *J.D.B.*, 131 S. Ct. at 2402 (citing *Keohane*, 516 U.S. at 112). The inquiry focuses on the objective circumstances; the subjective beliefs held by the interrogating officers and the person being interrogated are not germane. *Stansbury*, 511 U.S. at 322.

In *Sprosty v. Buchler*, the Seventh Circuit identified five factors that are "significant in determining whether a person is in custody": (1) whether "and to what extent" the suspect was informed that questioning was voluntary; (2) whether police have employed subterfuge; (3) the degree to which the interrogation is "police dominated"; (4) whether the suspect was restrained; and (5) whether the suspect could reasonably believe he could terminate the interrogation and leave. 79 F.3d 635, 641 (7th Cir. 1996).

In *Craighead*, the Ninth Circuit identified four factors that are specifically relevant to determining whether an in-home interrogation was custodial: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *Craighead*, 539 F.3d at 1084. [3] Deciding whether an in-home interrogation was custodial "is necessarily fact intensive." *Id.* (citing *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)).

*/// /// ///*

*/// /// ///*

*/// /// ///*

---

[3] The court's analysis relies on Seventh and Ninth Circuit law because the search occurred in the Seventh Circuit, Mr. Warras was indicted in the Ninth Circuit, and no actual conflict of law exists between the two circuits. *See* (Docs. #98, #100, #101); *infra* n. 3.

## III.   DISCUSSION

Mr. Warras' motion presents two[4] questions: (1) whether the government's conduct during the search turned Mr. Warras' home into a custodial setting that required *Miranda* warnings; and (2) if so, whether the statements Mr. Warras made during the second interrogation at the Forum Family Restaurant are inadmissible fruits of the poisonous tree?

### A.   Whether Mr. Warras' Home was a Custodial Setting?

Application of the Fifth Amendment to in-home interrogations "presents some analytical challenges." *Craighead*, 539 F.3d at 1082. "The home occupies a special place in the pantheon of constitutional rights." *Id.* at 1077. It is protected by the First Amendment, which prohibits the government from telling a person, sitting alone in his home, what he may read or watch. *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). It is protected by the Second Amendment, which prohibits a federal "ban on handgun possession in the home." *Dist. of Columbia v. Heller*, 554 U.S. 570, 128 (2008). It is protected by the Third Amendment, which forbids quartering soldiers "in any house" in time of peace "without the consent of the Owner." U.S. CONST. amend. III. It is protected by the Fourth Amendment, which protects the home from unreasonable searches and seizures. U.S. CONST. amend. IV.

---

[4] On May 1, 2015, the court granted the parties leave to file supplemental briefs on a third question regarding a choice-of-law issue: whether Mr. Warras' constitutional rights are governed by the law of the Seventh Circuit, where the search and interrogation occurred, or the Ninth Circuit, where he was indicted? (Doc. #98). The parties agree that the circumstances of the government's prosecution presents a choice-of-law question because the interrogation and indictment occurred in different circuits. (Docs. #100, #101); s*ee also United States v. Ozuna*, 129 F. Supp. 2d 1345, 1352 (S.D. Fla. 2001), aff'd, 48 F. App'x 739 (11th Cir. 2002); *United States v. Longo*, 70 F. Supp. 2d 225, 261 (W.D.N.Y. 1999); *United States v. Gerena*, 667 F. Supp. 911, 927 (D. Conn. 1987). They also agree that Seventh Circuit law controls because the interrogation occurred in Wisconsin. Nonetheless, the parties argue that the choice-of-law question is moot because there is no conflict of law: both circuits agree on the definition of custody under *Miranda* and routinely consider the same or similar factors when determining whether a suspect was in custody during an interrogation. *See* (Docs. #100, #101). The court finds that Seventh Circuit law controls and that Ninth Circuit law provides very persuasive authority because *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) is directly on point.

Under the Fifth Amendment, a suspect's mere presence in his home during an interrogation is said to protect his freedom from the government's imposition of countervailing pressures. Home is where one's family resides, which provides moral support. *Miranda*, 384 U.S. at 450 ("[H]is family and other friends are nearby, their presence lending moral support."); *Elstad*, 470 U.S. at 315 ("The initial conversation took place at midday, in the living room area of respondent's own home, with his mother in the kitchen area, a few steps away."); *United States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir. 1990) ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements."). Home is familiar and comfortable, which provides shelter from psychological coercion. *See Orozco v. Texas*, 394 U.S. 324, 326 (1969); *Craighead*, 539 F.3d at 1083, 1088; *United States v. Brown*, 441 F.3d 1330, 1346–47 (11th Cir. 2006) ("[C]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.") (emphasis original). These features generally insulate a suspect from police coercion by neutralizing the pressures that would arise if the interrogation were to occur at the police station. *Craighead*, 539 F.3d at 1083 (citing 2 WAYNE R. LAFAVE, CRIMINAL PROCEDURE § 6.6(e) (3d ed. 2007)).

The home's protective effects greatly diminish when the home is the object of government scrutiny. The government's legitimate law enforcement needs (i.e., evidence preservation and officer safety) require police officers to temporarily dominate a home when executing a search warrant. *Michigan v. Summers*, 452 U.S. 692, 702 (1981) ("Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers."); *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014) ("Searching investigators typically come armed and in groups of sufficient

number to ensure officer safety."); *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011) ("Any warrant search is inherently police dominated; there is nothing untoward about that circumstance."). When such dominance is exerted to secure the home, the situation is custodial. *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (finding an interview custodial that occurred when dominance was asserted to secure a home to execute a search warrant); *United States v. Kim*, 292 F.3d 969, 977 (9th Cir. 2002) (finding an interview custodial that occurred when dominance was asserted to secure a store to execute a search warrant).[5]

Even after the home is secured, the search compromises the home's protective effects. A government search upends familiar surroundings; and occupants may be separated for a short period of questioning. *See Revels*, 510 F.3d at 1275 (citations omitted). A reasonable person is not likely to find comfort or shelter from psychological pressure in his home when a neutral magistrate judge has determined that it should be intruded because its contents are suspicious. *See Kim*, 292 F.3d at 974 (being confronted with evidence of guilt may render an interrogation custodial); *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (same); *Lowe v. United States*, 407 F.2d 1391, 1397 (9th Cir. 1969) (same); *see also United States v. Hashime*, 734 F.3d 278, 284 (4th Cir. 2013) (stating that the suspect and his family's loss of control over their home may render an interrogation custodial). Indeed, when a search warrant is executed, a person's mere presence in the home often requires limited detention and interrogation of the occupants as a matter of course:

---

[5] *Accord United States v. Peck*, 17 F. Supp. 3d 1345, 1347 (N.D. Ga. 2014) (stating that an interview would have been custodial if it had occurred when the government temporarily dominated a home to secure it to execute a search warrant); *United States v. May*, No. 208–cr–12–PMP–GWF, 2009 WL 1542557, at *17 (D. Nev. May 29, 2009) ("Obviously, the circumstances at the beginning of the search created a highly police dominated atmosphere in which a reasonable person in Defendant's position would not have felt he was free to leave.").

[t]he existence of a search warrant . . . provides an objective justification for the detention [of an occupant]. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. [. . .] The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant. [. . .] Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.

*Summers*, 452 U.S. at 703–05.

These objective circumstances place an occupant's Fifth Amendment rights in jeopardy. When police officers execute a search warrant in the home, there is a legitimate law enforcement need to dominate the home and temporarily detain and interrogate the occupants. *See id*. If the interrogation becomes custodial, the occupants must be Mirandized. *Miranda*, 384 U.S. at 444; *Revels*, 510 F.3d at 1275 (holding that a reasonable Fourth Amendment search does not obviate an officer's obligation under *Miranda*); *Kim*, 292 F.3d at 977 (same). But if the person being interrogated inside his home is told he is free to leave, where will he go? "To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." *Craighead*, 539 F.3d at 1083 (citing *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004)). And if the person chooses to stay, what will he do? Deduce that he should remain silent while unfamiliar government agents explain their presence, rummage through his belongings, scan his computers, and monitor his movements? This is unlikely. *See Summers*, 452 U.S. at 701–03; *Craighead*, 539 F.3d at 1083.[6] The presence of a valid search warrant increases the probability that a reasonable

---

[6] In *Summers*, the Supreme Court stated, "we may safely assume that most citizens—unless they intend flight to avoid arrest—would elect to remain in order to observe the search of their possessions. [. . .] Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand." 452 U.S. at 701–03. The Ninth Circuit voiced a comparable concern in *Craighead*: "[A] reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." 539 F.3d at 1083.

13

occupant will make self-incriminating statements, especially if the occupant participates in the search.[7] The decision not to Mirandize under these circumstances creates a hazardous grey zone.

No circuit court has held that an occupant must be Mirandized as a matter of course when the police execute a search warrant in the home. *See, e.g.*, *Williams*, 760 F.3d at 815 (stating that no bright-line rule exists); *Revels*, 510 F.3d at 1275 (stating that the inquiries under the Fourth and Fifth Amendment are separate); *Kim*, 292 F.3d at 977 (same). The First and Ninth Circuits have determined that the best practice is to Mirandize the occupant and provide the prophylactic as he adjusts to the psychological shock of the intrusion or postpone the interrogation until a non-custodial moment. *Craighead*, 539 F.3d at 1086 (quoting *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007)). This protects the suspect's "constitutional rights and the government's legitimate law enforcement needs." *Mittel-Carey*, 493 F.3d at 40. And it produces an efficient result by obviating the court's fact-intensive determination of whether an in-home interrogation was, at some point, custodial. If best practices are not followed, the government gambles with the occupant's constitutional rights and the possibility that evidence will be excluded at trial.

The government gambled here. It executed a search warrant in Mr. Warras' home, decided not to Mirandize him, and created a police-dominated atmosphere that restrained his freedom of movement to the same degree associated with a formal arrest. The court's analysis begins with the objective circumstances at the time when Mr. Warras entered his home. At that point, his grandson was subjected to a limited detention on the living room couch, six FBI agents and two information technology specialists were executing the search warrant in various locations throughout the house, and Mr. Warras' freedom of movement was immediately restrained when he entered. An agent approached, stopped him from

---

[7] A reasonable person is not presumed to be versed in the nuances of constitutional law and the different rights and protections afforded by the Fourth and Fifth Amendment. A reasonable person is also presumed to be innocent. *See Florida v. Bostick*, 501 U.S. 429, 438 (1991); *United States v. Bravo*, 295 F.3d 1002, 1009 (9th Cir. 2002).

14

wandering freely throughout his home, and contacted the lead FBI agent, Agent Austin, who conducted a brief investigatory interview. Agent Austin stated that the FBI was executing a search warrant and told Mr. Warras that he was not under arrest and was free to leave.

These limited restraints were not custodial. They align with the Supreme Court's decision in *Terry v. Ohio* as applied to warranted in-home searches by *Michigan v. Summers. See Summers*, 452 U.S. at 698–705 (relying on *Terry* and holding that an occupant may be temporarily stopped or detained when a search warrant is executed to assure officer safety and preserve evidence, which are independent interests from the government's interest in investigating crime and apprehending suspects."); *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (restraining an occupant's freedom of movement "identifies only a necessary and not a sufficient condition for *Miranda* custody"); *Craighead*, 539 F.3d at 1087 (citing *Griffin*, 922 F.2d at 1349) (telling a suspect that he is free to leave "greatly reduces the chance that a suspect will reasonably believe he is in custody.").

The objective circumstances changed when Mr. Warras chose to remain in his home, despite Agent Austin's desire. Mr. Warras was (1) isolated from his grandson, (2) restrained from moving around freely, (3) taken into the basement and not told that the questioning was voluntary, (4) subjected to subterfuge that induced self-incrimination, and (5) interrogated in a police-dominated setting for two hours. These five restraints were custodial under *Craighead* and *Sprosty*.[8] Each of these restraints is discussed in detail below.

### 1.   Mr. Warras was Isolated from Family

First, it is well settled that separating a suspect from his family for questioning is a custodial-type restraint. *See Miranda*, 384 U.S. at 450 (quoting a manual on police interrogation stating that the presence

---

[8] As noted above, Seventh Circuit law is controlling and the Ninth Circuit's decision in *Craighead* provides very persuasive authority because it is directly on point to the questions presented by Mr. Warras' motion.

of family lends the suspect moral support and inhibits the officer's psychological advantage); *Elstad*, 470 U.S. at 315 (finding an interrogation noncustodial because a family member was in the next room); *Griffin*, 922 F.2d at 1352 ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements."). In *Craighead*, the Ninth Circuit directed lower courts to consider whether the suspect was isolated from others when determining if an in-home interrogation was custodial. 539 F.3d at 1086–87.

In this case, the government argues that "Warras was never isolated from his grandson or others in the home." (Doc. #70 at 6:20); *accord* (Doc. #92 at 5:2–3) ("At no time did the agents seek to isolate Warras from his grandson."). These assertions contradict the government's evidence. Agent Austin's testimony and the FBI's reports conclusively demonstrate that Mr. Warras was isolated from his grandson for an interrogation. Agent Austin testified that he and Agent Due moved Mr. Warras into the basement because the presence of the FBI and his grandson in the same room at the same time frustrated Mr. Warras' ability to focus on the agents and communicate with the FBI. Agent Austin testified that Mr. Warras was "agitated," "clearly had a lot coming at him at once," was "becoming more emotional," and was growing "more and more frustrated." (Mins. Proceedings #90).

By isolating Mr. Warras from his grandson, the FBI eliminated the moral support that is crucial to a suspect's ability to withstand government coercion. *See Craighead*, 539 F.3d at 1087 (citing *Miranda*, 384 U.S. at 445–46) ("[T]he Supreme Court was explicit that the law enforcement technique of isolating the suspect from family and friends is one of the distinguishing features of a custodial interrogation."). There is no question that the presence of Mr. Warras' grandson in the living room impeded the FBI's interrogation. Agent Austin testified that his initial interaction with Mr. Warras "wasn't good" and that

Mr. Warras was not responding to the agents because his grandson was in the room. (Mins. Proceedings (#90 at 33:00). As a result, Agent Austin isolated Mr. Warras to "have an orderly conversation." (*Id.*)

Nor is there any doubt that Mr. Warras incriminated himself after he was separated from his grandson. Agents Austin and Due isolated Mr. Warras and asked him questions from a list that had been prepared by a case agent in Las Vegas. (Mins. Proceedings #90 at 43:15). Mr. Warras incriminated himself and stated that "he would feel more comfortable answering Agent Austin's questions with an attorney present." (Ex. B. (#67-1) at 7). When the FBI refused to honor's Mr. Warras' request, Mr. Warras reflected and said, "I think I'll just kill myself. This is a small community" and stated, "[b]ut, I mean, in front of my grandson?" (*Id.*)

The court finds that these facts demonstrate that Mr. Warras' grandson provided the type of moral support that is crucial to a suspect's ability to withstand government coercion. When the grandson was present, Mr. Warras demonstrated resolve in accordance with his constitutional rights. When the grandson was absent, Mr. Warras succumbed to government coercion and incriminated himself.

    2.    Mr. Warras was Restrained

Second, the court considers whether the suspect was restrained. *Craighead*, 539 F.3d at 1085 ("Second, we consider whether the suspect was at any point restrained, either by physical force or by threats."); *Sprosty*, 79 F.3d at 641 (directing courts to consider "the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed.").

When Mr. Warras was removed from the living room, he was flanked by agents on either side, escorted into the basement, and told that he could not move without permission or supervision.[9] The

---

[9] Agent Austin testified that Mr. Warras was not required to ask permission to move. His own testimony belies this conclusion: "Q. He had to ask permission? A. Uh, I wouldn't call it that. It would be more like, 'Do you mind if I

upshot of these restraints is threefold. First, it placed conditions on Mr. Warras' right to leave. If he had decided to leave, he would not have been free to leave; he would have required government permission to depart and supervision as he departed. And if he had exercised his right to leave freely (i.e., without requesting permission or supervision), he would have been stopped. These objective circumstances placed restraints on Mr. Warras' freedom of movement. He was permitted to either ask permission and subject himself to supervision, which is a restraint, or attempt to leave freely and be stopped, which is also a restraint.

In *Craighead*, the Ninth Circuit stated that custody is likely to be found in these circumstances. The court stated:

> [T]he suspect may reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers he will encounter on the way out. The suspect may also believe that the large number of officers was brought for the purpose of preventing his departure. [. . .] Restraint amounting to custody may also be inferred where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times.

539 F.3d at 1085 (citing *Mittel–Carey*, 493 F.3d at 40) (finding an interrogation custodial where the suspect was escorted by agents on the three occasions that he was permitted to leave the interrogation space, including while he used the bathroom). Here, there is no question that Mr. Warras believed he would have been stopped if he attempted to leave freely because Agents Austin and Due told him that he required constant supervision and permission to move. This type of restraint requires *Miranda* warnings, even though the restrain is not physical. *See Miranda*, 384 U.S. at 448 (stating that custodial interrogation is "psychologically rather than physically oriented" because the "the modern practice of in-custody interrogation" involves the application of mental coercion).

---

get a glass of water?' 'Yes.'" Q. Or do you mind if I use the bathroom? A. Yes. Q. Correct? A. Correct." (Mins. Proceedings #90 at 1:12:00). This exchange demonstrates that Mr. Warras was required to ask permission to move.

Nor did the agents' statement that Mr. Warras was "free to leave" render the situation non-custodial. *See Craighead*, 539 F.3d at 1087 (citing *United States v. Lee*, 699 F.2d 466, 467–68 (9th Cir.1982) (per curiam) ("The mere recitation of the statement that the suspect is free to leave or terminate the interview, however, does not render an interrogation non-custodial *per se*.")). Agent Austin testified that he and the other agents "coordinat[ed] [Mr. Warras'] movements within a controlled space" and that Mr. Warras was "absolutely" not trusted to move around freely. (Mins. Proceedings #90 at 1:03:45, 1:06:00) (Q. "But you also didn't trust him to move around freely?" A. "Oh—and that is uh—that is for sure. Absolutely."). This testimony weighs very heavily in favor of finding that Mr. Warras was in custody.

Second, the restraints placed on Mr. Warras deprived him of police-free rooms in his own home. *See Craighead*, 539 F.3d at 1084 ("[The police] may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation."). Agent Austin testified that Mr. Warras was only permitted to be alone while in the bathroom for a brief period of time and that Agent Austin considered intervening even though Mr. Warras was alone in the bathroom only for a brief period of time. Agent Austin testified this was the only time Mr. Warras was left alone and that leaving him in a police-free room would have been "a failure to supervise." (Mins. Proceedings #90 at 51:00).

Third, the restraints placed on Mr. Warras required one or more agents to terminate the search, or divert their attention from it, and stand guard over Mr. Warras. *See Sprosty*, 79 F.3d at 642 (finding custody where one of the officer's "role at the mobile home was to guard [the suspect], not to execute the search warrant."); *Griffin*, 922 F.2d at 1350–51 ("We realize that the likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to

associate these restraints with a formal arrest."). Agent Austin testified that Mr. Warras was supervised at all times and that he wanted Mr. Warras to leave so the agents could focus on the search.

The government contends that the interrogation was not custodial because the agents' maintained a friendly tone and refrained from touching Mr. Warras, and told him that he was not being arrested and was free to leave. (Doc. #92 at 11). The court is unpersuaded. Although the officer's tone is relevant to the court's inquiry, the relevant language is "the language used to summon the individual." *United States v. Bassignani*, 560 F.3d 989, 994 (9th Cir. 2009). Here, it is unclear what language was used to summon Mr. Warras and prevent him from escaping the FBI's control and wandering freely throughout his own home. Agent Austin merely testified that Mr. Warras' initial interaction with the FBI "wasn't good." (Mins. Proceedings #90).

The court is similarly unpersuaded that Mr. Warras was not in custody simply because the agents told him that he was free to leave and refrained from touching him. As stated in *Craighead*, "[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview, however, does not render an interrogation non-custodial *per se*." 539 F.3d at 1087 (citation omitted); *see also United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007) ("Indeed, there is no precedent for the contention that a law enforcement officer simply stating to a suspect that he is 'not under arrest' is sufficient to end the inquiry into whether the suspect was 'in custody' during an interrogation."). Nor does the absence of physical restraints render an interrogation non-custodial *per se*. *Id*. (citing *Orozco*, 394 U.S. at 325). In *Orozco*, the Supreme Court found that a suspect was in custody where four officers refrained from physically retraining the suspect and merely acted as though he was "not free to leave." 394 U.S. at 325.

> 3.   Mr. Warras was not Informed that the Interrogation was Voluntary

Third, the court considers "whether the suspect was informed that questioning was voluntary and that he was free to leave or terminate the interview" and "the context of the physical characteristics of the

20

interview location." *Craighead*, 539 F.3d at 1087–89; *see also Sprosty*, 79 F.3d at 641 (directing courts to consider "whether and to what extent the person has been made aware that he is free to refrain from answering questions").

Here, Mr. Warras was taken into the basement and not informed that the questioning was voluntary. *See* (Mins. Proceedings #90); (Doc. #67 at Ex. A–C). Agent Austin testified that he chose to isolate Mr. Warras in the basement because it had been secured by the FBI and was under the FBI's control. *See Griffin*, 7 F.3d at 1518–19 ("Where police are in full control of the questioning environment, custody is more easily found."). These circumstances weigh heavily in favor of finding that Mr. Warras was interrogated in a custodial setting. Agent Austin's subjective opinions that he believed Mr. Warras would be more comfortable and less distracted if he were taken into the basement are irrelevant. *See Alvarado*, 541 U.S. at 668 (the suspect's psychological factors are irrelevant for *Miranda* purposes); *Stansbury*, 511 U.S. at 323 (the "subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant).

An in-home interrogation is more likely to be custodial when the police relocate the suspect from the living room or kitchen to a room of the government's choosing. In *Miranda*, the Supreme Court cited a police manual that instructed officers how to establish a custodial setting that would likely induce a suspect to incriminate himself. It stated: "If at all practicable, the interrogation should take place in the investigator's office or *at least in a room of his own choice*." 384 U.S. at 449 (citing INBAU & REID, CRIMINAL INTERROGATION AND CONFESSIONS 99 (1962)) (emphasis added). This rule was echoed by the Ninth Circuit in *Craighead*: "[a]n interview conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere." 539 F.3d at 1088.

The court is unpersuaded by the government's assertion that the setting was noncustodial because it occurred in a basement with an open floor plan that was furnished with exercise equipment. (Doc. #97 at 11:6–7). If the court accepted this argument, it would render many people's basements immune from *Miranda's* requirements. And although Mr. Warras' basement appears more comfortable than the storage closet that provided the custodial setting in *Craighead*, the mere fact that the FBI removed Mr. Warras from his home's living quarters militates in favor of a finding that the setting was custodial. *See Elstad*, 470 U.S. at 315; *Craighead*, 539 F.3d at 1088. Basements generally do not provide the comfortable and familiar surroundings that noncustodial in-home interrogations cases contemplate. *Compare Elstad*, 470 U.S. at 315 ("The initial conversation took place at midday, in the living room area of respondent's own home, with his mother in the kitchen area, a few steps away.") *with Hashime*, 734 F.3d at 281 (holding that a suspect was in custody when he "was escorted by two officers to the basement for interrogation" and isolated from his family).

4.   Mr. Warras was Subjected to Subterfuge

Fourth, the court considers whether Mr. Warras was subjected to subterfuge that induced self-incrimination. *Sprosty*, 79 F.3d at 641 (citing *United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996)). Here, the agents presented Mr. Warras with a valid search warrant and then interrogated him on matters that were the subject of the search warrant. These objective circumstances cause subterfuge by creating the impression that a search warrant authorizes an interrogation.

A homeowner's Fourth Amendment rights are separate from his Fifth Amendment rights. And a police officer's compliance under the Fourth Amendment does not obviate his duty to comply with the Fifth Amendment. *Craighead*, 539 F.3d at 1089 (finding an in-home search constitutional and an in-home interrogation constitutional); *Revels*, 510 F.3d at 1275 (holding that a lawful investigatory detention under

the Fourth Amendment does not obviate a police officer's obligations under *Miranda*); *Kim*, F.3d at 977 (same). However, a reasonable homeowner is not presumed to know the nuances of his constitutional rights. Accordingly, when a reasonable homeowner is presented with a search warrant and then interrogated on matters germane to the search warrant, the objective circumstances create subterfuge by conflating the homeowner's Fourth and Fifth Amendment rights.

From the perspective of a reasonable homeowner, the search warrant is likely to appear as the predicate that authorizes the interrogation.[10] Unless the homeowner is told that the interrogation is voluntary, he will not know that a search warrant authorizes the police to seize the homeowner's papers and effects, but not the homeowner's ideas and statements regarding those papers and effects. And if the homeowner is not informed that he has the right to remain silent, what will he do? Deduce that he should remain silent while a police officer presents a warrant and interrogates him? Without *Miranda* warnings, a police officer creates confusion by presenting a homeowner with a valid search warrant and interrogating him on matters germane to the search warrant. Whether the police officer subjectively intends these objective circumstances to create subterfuge is irrelevant. *See Alvarado*, 541 U.S. at 668; *Stansbury*, 511 U.S. at 323.

In addition to creating subterfuge in the homeowner's mind, conflating a homeowner's Fourth Amendment rights with the homeowner's Fifth Amendment rights in this manner violated *Michigan v. Summers*. There, the Supreme Court relied on *Terry v. Ohio* to hold that a search warrant implicitly carries the limited authority to detain and interview the occupants of a home when police officers execute the search warrant. *Summers*, 452 U.S. at 698, 705 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). In so holding, the Supreme Court stated that "the type of detention imposed here is not likely to be exploited by the

---

[10] A reasonable person is also presumed to be innocent. *Bostick*, 501 U.S. at 438; *Bravo*, 295 F.3d at 1009.

officer or unduly prolonged in order to gain more information, because the information the officers seek

normally will be obtained through the search and not through the detention." 452 U.S. at 701.

In this case, Agent Austin testified that he prolonged Mr. Warras' detention in order to gain

information through an interview that should have been gained through the search:

> Q.    You asked him about Malom Group, correct?
> A.    Correct.
> Q.    You asked him about NY Consultants?
> A.    I don't specifically recall; but that would have been consistent with the
>       general back-and-forth conversation. Yes.
> Q.    But that was the nature of the investigation, correct? It involved those
>       companies?
> A.    And others. Correct.
> Q.    So you were asking him about the case that was being investigated?
> A.    That is correct. And that is pertinent because that is what led to the search
>       warrant and it was important for him to be able to make that connection, at
>       least in my mind.

 (Mins. Proceedings #90 at 1:07:00–1:07:40). This detention and interrogation exceeded *Summers*' scope

and thereby offended *Miranda*. *Miranda* is designed to address interrogation practices, like this, that are

likely to prevent a suspect from making "a free and rational choice" about speaking. 384 U.S. at 464–67.

When the police present a suspect with a valid search warrant and then interrogate him on matters that are

germane to the search warrant, the objective circumstances create subterfuge and impede a suspect from

making the "free and rational choice" that *Miranda* protects.

5.    Mr. Warras' Interrogation was Police Dominated

Fifth, the court considers the degree to which the interrogation was police dominated, the number

of law enforcement officers present, and whether the officers were armed. *Craighead*, 539 F.3d at 1084;

*Sprosty*, 79 F.3d at 641. The government argues that Mr. Warras' home was not police dominated because

the agents had removed their protective gear, no guns were drawn, and there was a "casual atmosphere

. . . highlighted by the fact that . . . Warras showed the agents a framed golf scorecard and joked about

24

his various medical ailments, even showing them a surgical scar on his stomach." (Doc. #70 at 7); (Doc. #92 at 11). The court is unpersuaded.

The mere fact that Mr. Warras showed the agents memorabilia or made jokes is insufficient to conclude that his home was not police dominated. The question is not simply whether Mr. Warras subjectively felt free to leave; but weather a reasonable person in his position would have felt free to leave. *J.D.B.*, 131 S. Ct. at 2402. Mr. Warras' subjective mental state as reflected by his jokes are not germane. *Stansbury*, 511 U.S. at 322. And although the agents removed their protective gear and refrained from withdrawing their weapons, additional facts demonstrate that Mr. Warras' home was police dominated.

A warranted search of the home "is inherently police dominated." *Perrin*, 659 F.3d at 721. As in this case, "[s]earching investigators typically come armed and in groups of sufficient number to ensure officer safety." *Williams*, 760 F.3d at 815. When Mr. Warras returned from the gym, his home was occupied by six FBI agents who were visibly armed and two FBI information technology specialists. Mr. Warras' grandson was subjected to a limited detention on the living room couch; Mr. Warras was isolated from his grandson, escorted into the basement, and placed under guard by visually armed agents.

These circumstances turned Mr. Warras' home into a police-dominated atmosphere. The Ninth Circuit has stated "the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere." *Craighead*, 539 F.3d at 1085. "When a large number of law enforcement personnel enter a suspect's home, they may fill the home such that there are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the interrogation." *Id*. at 1084. As discussed above, the nature of the FBI's escort and supervision of Mr. Warras deprived Mr. Warras of police-free rooms because Agent Austin "absolutely" did not want to leave Mr. Warras alone. *See* (Mins. Proceedings #90). These circumstances rendered Mr. Warras' home police dominated. In Agent Austin's own words, Mr. Warras' home was "our [i.e., the FBI's] controlled space."

(Mins. Proceedings #90 at 30:00).

**B.     Whether the Second Interrogation was Tainted?**

Because the government interrogated Mr. Warras in violation of *Miranda*, the court must consider a second question: whether incriminating statements that Mr. Warras made three days later should be suppressed as the fruit of the poisonous tree? The court begins with the governing law.

1.     *Miranda* Violations & the Exclusionary Rule

The exclusionary rule is a judge-made rule that penalizes police misconduct. *Coolidge v. New Hampshire*, 403 U.S. 443, 499 (1971); *Spano v. New York*, 360 U.S. 315, 320–21 (1959) ("[T]he police must obey the law while enforcing the law; [] in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."). The exclusionary rule generally prohibits the government from introducing evidence against a criminal defendant if the evidence was unlawfully seized or is the "fruits" of an unlawful search and seizure. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

The Fifth Amendment provides an exception to this general rule. *See Elstad*, 470 U.S. at 305–06. If the government obtains a confession in violation of *Miranda*, the confession is presumptively coerced and excluded from the prosecutor's case in chief. *Id*. at 313–14; *Miranda*, 384 U.S. at 444. But the exclusionary rule does not automatically prohibit the government from introducing into evidence a subsequent confession that is obtained in compliance with *Miranda*. *Elstad*, 470 U.S. at 300. When examining a subsequent confession, admissibility turns "on whether [the subsequent confession] is knowingly and voluntarily made." *Seibert*, 542 U.S. at 612 at n. 4 (quoting *Elstad*, 470 U.S. at 309); *United States v. Schmidt*, 573 F.2d 1057, 1062 (9th Cir.), cert. denied, 439 U.S. 881 (1978). This means that the "fruits" of an unlawful interrogation are not automatically excluded at trial.

The Ninth Circuit has identified four factors to consider when determining whether a subsequent confession is knowingly and voluntarily made: (1) a break in the stream of events sufficient to insulate the statement from the effect of all that went on before; (2) inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances; (3) the time that passes between confessions, the change in the place of interrogations, and the change in identity of the interrogators; and (4) removal of the conditions which preclude the use of the first statement. *United States v. Patterson*, 812 F.2d 1188, 1192 (9th Cir. 1987).[11]

> 2.   Mr. Warras' Incriminating Statements were Knowing and Voluntary

The court first considers whether there was "a break in the stream of events sufficient to insulate the statement from the effect of all that went on before." *Id*. (citing *Clewis v. State of Tex*., 386 U.S. 707, 709 (1967)). This factor weighs in the government's favor. In *Clewis*, the Supreme Court held that a suspect's second confession was not voluntary where the suspect confessed while in custody on July 13, and remained in custody until July 17, when he confessed again. 386 U.S. at 709–10; *accord Reck v. Pate*, 367 U.S. 433, 444 (1961) (finding a second confession involuntary where a suspect confessed while in custody on a Saturday and confessed again while still on custody on Sunday).

The circumstances of Mr. Warras' interrogations are not analogous. On July 16, he was taken into custody in his home and released two hours later. Three days later, he voluntarily appeared at a public restaurant to retrieve personal property that was mistakenly seized by the FBI. While retrieving his

---

[11] Mr. Warras' motion heavily relies on *United States v. Shetler*, 665 F.3d 1150, 1159 (9th Cir. 2011), a case that involved an unlawful search under the Fourth Amendment and a subsequent confession under the Fifth Amendment. Because the exclusionary rule treats evidence obtained in violation of the Fourth Amendment differently than evidence obtained in violation of the Fifth Amendment, *see Elstad*, 470 U.S. at 300, *Shelter* is inapplicable here. *See also United States v. Bayer*, 331 U.S. 532, 540–41 (1947) ("[A] later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.").

belongings, he made additional incriminating statements in a non-custodial setting. The court finds that the change in locations, absence of a custodial setting, Mr. Warras' voluntary appearance at the restaurant, and the basis for the second meeting constitute "a break in the stream of events sufficient to insulate" Mr. Warras from the effect of the prior interrogation.

It is inapposite that Mr. Warras was not Mirandized before being interrogated in the restaurant. *Miranda* only attaches to custodial interrogations. 384 U.S. at 444. The interrogation on July 19 was non-custodial. Nor are Mr. Warras' statements on July 19 inadmissible because Mr. Warras had invoked his right to counsel on July 13. In *Edwards v. Arizona*, the Supreme Court established a bright-line rule: when an accused, in a custodial setting, invokes the right to counsel, the police must immediately cease all interrogation and may not resume questioning without the presence of counsel. 451 U.S. 477, 484–85 (1981). The government did not fail to scrupulously honor Mr. Warras' invocation of the right to counsel because Mr. Warras was not in custody on July 19 when he voluntarily appeared to meet Agent Due.

Second, the court considers "inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances." *Patterson*, 812 F.2d at 1192 (citing *Lyons v. State of Oklahoma*, 322 U.S. 596, 602 (1944)). This factor also favors the government. When Mr. Warras was interrogated a second time on July 19, nearly all of the coercive practices that were present on July 13 were absent. On July 19, Mr. Warras was not isolated from family by the government, relocated into a room controlled by the government, restrained from moving freely, subjected to subterfuge, or interrogated in a police-dominated atmosphere.

Third, the court considers "the time that passes between confessions, the change in the place of interrogations, and the change in identity of the interrogators." *Patterson*, 812 F.2d at 1192 (citing *Elstad*, 470 U.S. at 310). This factor is either neutral or weighs in the government's favor. Although Agent Due was present for both interrogations, Mr. Warras' second interrogation did not occur in a custodial setting

28

and it occurred three days after the first interrogation. *See Elstad*, 470 U.S. at 313–14 (finding thirty minutes sufficient); *but see Clewis*, 386 U.S. at 709–10 (finding four days insufficient).

Fourth, the court considers "removal of the conditions which preclude the use of the first statement." *Patterson*, 812 F.2d at 1192 (citing *Bayer*, 331 U.S. at 539). As stated above, when Mr. Warras was interrogated on July 19, nearly all of the coercive conditions had been lifted. Mr. Warras was no longer separated from family by the government, relocated into a room controlled by the government, restrained from moving freely, subjected to subterfuge, or interrogated in a police-dominated atmosphere.

The court therefore finds that the statements Mr. Warras made on July 19 were knowing and voluntary.

## IV.   CONCLUSION

Considering the totality of the circumstances as analyzed under *Craighead* and *Sprosty*, the court finds that Mr. Warras' home was a police-dominated atmosphere that a reasonable person would not have felt free to leave. Certain facts militate in favor of a finding that Mr. Warras' home was a noncustodial setting: Mr. Warras was told that he was free to leave and not under arrest; the agents' maintained a friendly and respectful tone; and Mr. Warras was neither physically restrained nor threatened.

But these facts are greatly outweighed by other considerations. Mr. Warras was taken away from his grandson, isolated in the basement (a location the government chose), told that he must remain under guard, subjected to subterfuge that induced self-incrimination, and not informed that his interrogation was voluntary. These circumstances placed restraints on Mr. Warras' freedom to the same degree associated with a formal arrest. *Miranda* warnings were required. This facts require the court to suppress the statements Mr. Warras made on July 13.

Circumstances changed when Mr. Warras was re-interrogated at the Forum Family Restaurant three days later. Mr. Warras voluntarily appeared at the restaurant to retrieve personal property. During

his meeting with the government, nearly all of the coercive conditions that were present for the previous interrogation were absent. Mr. Warras was not isolated from family by the government, relocated into a room controlled by the government, restrained from moving freely, subjected to subterfuge, or interrogated in a police-dominated atmosphere. This facts persuade the court that the statements made on July 19 were knowing and voluntary.

ACCORDINGLY, and for good cause shown,

IT IS RECOMMENDED that James Warras' Motion to Suppress (#67) be GRANTED in part and DENIED in part.

IT IS FURTHER RECOMMENDED that Mr. Warras' motion be GRANTED with regard to the July 16, 2013, interrogation and all statements by him be SUPPRESSED.

IT IS FURTHER RECOMMENDED that motion be DENIED with regard to the July 19, 2013, interrogation.

IT IS SO RECOMMENDED.

DATED this 18th day of May, 2015.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

30